745 So.2d 1094 (1999)
STATE of Florida, Appellant,
v.
Ronald James WHEELER, Appellee.
No. 98-1597.
District Court of Appeal of Florida, Fourth District.
November 24, 1999.
*1095 Robert A. Butterworth, Attorney General, Tallahassee, and Barbra Amron Weisberg, Assistant Attorney General, West Palm Beach, for appellant.
Gary S. Israel of Gary S. Israel, P.A., West Palm Beach, for appellee.
PER CURIAM.
The state appeals from an order granting the defendant's motion to dismiss his aggravated stalking charge. We reverse.
The defendant and his wife were separated. During the pendency of contested divorce proceedings, the circuit court issued a domestic violence injunction after the defendant attempted suicide. On August 18, 1997, the defendant was arrested and charged with aggravated stalking under section 784.048(4), Florida Statutes. According to the probable cause affidavit, the defendant violated the injunction by calling his wife and leaving threatening messages on her answering machine. The affidavit also recounted past instances wherein the defendant violated the restraining order by telephoning her, driving by her residence, contacting her at work, and following her.
The trial court ordered a psychological evaluation of the defendant. The defendant filed a notice of intent to rely on an insanity defense. One forensic psychiatrist, Dr. McKinley Cheshire, reported that the defendant was competent to stand trial but was insane at the time of the commission of the crime.
On the day the trial was scheduled to begin, the victim/wife was not present. The state requested a continuance because it had been unable to serve her. The defendant's counsel advised the court that he had some "additional evidence" that could explain why the victim was not present. He showed the court a letter he received from the victim stating that the defendant was not guilty of aggravated stalking and that she wanted the case to be dismissed. The trial court granted the state's motion for a continuance until the following day so the state could secure the victim's presence. The court warned, "[n]ow, if she's not here tomorrow morning, I'm inclined to grant a motion to dismiss it."
The following day the victim appeared in court. The trial judge placed her under oath, questioned her, and verified that she had voluntarily written and signed the letter. The victim explained that she and the defendant were close to finalizing their divorce and testified that she wanted the case against her husband dismissed. She acknowledged that a dismissal meant that the judge would no longer have authority to require the defendant to continue treatment recommended by the psychiatrists. Upon being shown her prior statements, the victim admitted that the incidents she reported had, in fact, occurred, and that the defendant had violated the restraining order on a few occasions. However, she testified that she never intended for the defendant to go to jail. She simply wanted some "space" and to be left alone.
When the defendant was questioned by the trial judge, he denied the aggravated stalking charges and testified that the statements contained in the police reports were untrue and inaccurate. He did not deny calling the victim's home, however, to speak to his children. After the defendant testified, his attorney moved ore tenus to dismiss the charges. He argued that "there is nothing to be served by the prosecution *1096 going forward. ... Mr. Wheeler has already served 63 days in jail. So I think the punishment had been meted out."
Over the state's objection that the court lacked authority to dismiss the case, the trial court granted the motion. The court determined that it was in the best interest of the people of the State of Florida, the parties, and their children to dismiss the case. The judge noted that the defendant had never before been arrested nor convicted of any crimes and that he was not a danger to the public and was no longer a danger to his wife.
The state correctly argues that the trial judge's actions in dismissing the aggravated stalking charge constituted an improper infringement upon its discretion to prosecute. See State v. Brown, 416 So.2d 1258 (Fla. 4th DCA 1982). Notwithstanding the court's belief that the best interests of the public and the parties would be served by dismissal, it is the state attorney who "must still make the final determination as to whether prosecution will continue." State v. Cleveland, 390 So.2d 364, 367 (Fla. 4th DCA 1980), approved, 417 So.2d 653 (Fla.1982). Similarly, the decision to prosecute does not lie with the victim of a crime. McArthur v. State, 597 So.2d 406 (Fla. 1st DCA 1992); State v. Bryant, 549 So.2d 1155 (Fla. 3d DCA 1989); Brown, 416 So.2d at 1259. In McArthur, the victim of a domestic violence battery did not want to pursue charges against the defendant. Rejecting the appellant's argument for dismissal, the court stated, "[t]he thrust of appellant's argument on this point is that he should not have been charged in a domestic dispute where the victim advised the state attorney's office that she did not wish to prosecute. Since the decision to charge was the prerogative of the prosecutor, the argument is unavailing." 597 So.2d at 408.
Even assuming, for the sake of argument, that the defendant had properly presented a motion to dismiss pursuant to Fla. R.Crim. P. 3.190(c)(4), the defendant would not have been entitled to a dismissal of the aggravated stalking charge where, as here, the state was able to establish a prima facie case against the defendant. Rule 3.190(c)(4) provides that a court may entertain a motion to dismiss where "[t]here are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." The defendant's wife testified that the incidents she described in her statements about the defendant's numerous injunction violations actually occurred. Moreover, the defendant did not contend, nor did the court find, that the undisputed facts failed to establish a prima facie case. Rather, the defendant argued that there was nothing to be served by allowing the prosecution to go forward. The trial judge agreed and based his dismissal order solely on the victim's desire not to pursue prosecution and his belief that justice would be best served by terminating the case since the parties had settled their differences and the defendant was not a threat to society or the victim. Dismissal for these reasons was error.
Therefore, we reverse and remand for reinstatement of the aggravated stalking charge against the defendant.
REVERSED and REMANDED.
GUNTHER and TAYLOR, JJ., concur.
FARMER, J., dissents with opinion.
FARMER, J., dissenting.
Most of the time a judge must insist on applying the strict letter of the law. After all ours isas the talking heads in the media like to incant incessantlya society of laws and not of people. But it is people who make up this society. Therefore once in a while it is much the best for this society of people, not to mention the parties, that the judge dispense simple justice even if some letters of the law get nudged into background. That is what Judge Sholts did here, and I for one would not disturb his Solomonic decision.
*1097 But as the majority insists on applying the strict letter of the law to overturn his decision, I should assay to apply the same stringency to sustain it. The Information charges that defendant "did, after an injunction for protection or after any other court imposed prohibition of conduct toward any person or that person's property, willfully, maliciously, and repeatedly follow or harass [his wife] contrary to Florida Statute 784.048(4)."[1] The essence of this charge is that defendant harassed his wife after an injunction of some kind is said to have been entered in their pending dissolution of marriage proceeding.
An injunction is required by law to be in writing,[2] but in all of this criminal file there is not even a hint as to what this alleged injunction forbade him from doing, much less a copy of any injunction itself. Moreover the essential fact for which an injunction under section 784.048 may issue is repeat violence against a person.[3] But this case is not at all about violence, for the wife made it clear to the trial judge that defendant never engaged in any violence against her or their children, at any timeever. What he did do during a time of deep depression was attempt to take his own life when he supposedly learned of infidelity by his wife. Whether that is what led to the supposed injunction we will never know in this appeal, for there is no injunction in our record.
The State Attorney charged defendant with a violation of section 784.048(4) after the wife called police during the midst of their divorce case and reported what she said were violations of this mythical injunction.[4] Actually the police report states that she complained of him calling her, driving past their residence, parking in the driveway and "following her," but nothing about any alleged violence toward her the children. The report does state that the immediate precipitating event for her call to the police was his repeated avowal to take his own life. One such avowal took place on the same day as a hearing in the pending divorce. In any case, nothing stated in the police report, which I gather constitutes the probable cause affidavit, remotely comes close to the letter of what the statute forbids.
Section 784.048(1) defines harassment as "a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate *1098 purpose." Apart from a reference to an injunction, there is nothing in the police report or Information that suggests that the wife suffered substantial emotional distress from the husband's conduct or that he lacked a legitimate purpose for being at their house, or for calling their house or for following the wife. He was, after all, the father of their three children (and a good father at that, according to the wife herself) with a visitation right at the house where the children resided with their mother. Moreover, as they were then involved in a contested divorce he had the right to seek evidence relating to matters such as alimony and child custody, evidence which might be gained by following her.
The Information does not address either the subject of substantial emotional distress or the exception for conduct that serves a legitimate purpose, both of which relate to elements of the crime charged. What has been charged is as consistent with the lack of real distress and the exception for legitimate conduct as it might conceivably be with "knowingly, willfully, maliciously and repeatedly follow[ing] or harass[ing]" the wife. My point is that the absence of the precise terms of the written injunction from the Information, coupled with the immensely ambiguous nature of the acts described, calls its legal sufficiency gravely into question. I do not think that the state has come anywhere near showing that the trial judge would have erred if he had granted a dismissal on the basis of rule 3.190(c)(4) for legal insufficiency.
But Judge Sholts's actual basis for dismissal is even more compelling than the majority suggests. Defendant had waived his right to a jury and had agreed to have the case tried to the judge instead. The case was scheduled to begin non-jury trial on the afternoon of April 16th before Judge Sholts without a jury. The state was present but not its principal witness the wifewithout whom the state could not possibly prove even the highly ambiguous charge in the Information. The record also demonstrates that the state had failed to serve her with a subpoena to compel her attendance at trial even though the assistant state attorney knew that the wife did not believe her husband guilty of the aggravated stalking charge and did not want to see him prosecuted. In fact the assistant state attorney had already agreed with the wife that the state would not require her testimony if she would willingly appear at trial. In spite of that agreement, the state sought a continuance of trial on the basis of the unavailability of this witness.[5] Judge Sholts was willing to continue the trial but only until the next morning.
When she did appear at trial on the next morning, the judge took testimony from both her and the defendant. She testified under oath, as I have already indicated, that he never engaged in any violence against her or their children at any time. Consequently the record establishes without contradiction that there was never any basis in the first place for an injunction against violence. It is very difficult for me to understand how the letter of this law would allow a criminal prosecution of aggravated stalking for an alleged violation of an injunction against repeat violence (if there really was an injunction) that was itself unsupported in fact and law.
Moreover, she testified unequivocally that her husband was a good father who saw his children regularly and paid his support. She testified that they had agreed to his visitation with the children at their house and to his frequent telephone contact with them. That testimony entirely negatives the balance of the Information. While she admitted that she did *1099 make the police reports in question, she also made equally clear that she did not make the reports because of any aggravated stalking. There is nothing in her testimony that would even remotely support a finding of willful and malicious harassment.
Again, the supposed injunction itself was not introduced into evidence by the state. We do not know precisely what conduct the alleged injunction prohibited, what the precise text of the command was.
"ROPER: We don't need to know the (Contemptuously) wordingwe know what it will mean.
"MORE: It will mean what the words say! An oath is made of words! It may be possible to take it. Or avoid it." [e.o.]
Robert Bolt, A Man For All Seasons, act II, at 125 (First Vintage Int'l Ed.1960). Like an oath, an injunction is founded on wordswords that may not have been violated by the conduct of the supposed contemnor.[6] So we have nothing in the record on which to base a finding of a violation of any injunction and hence of aggravated stalking.
So what is the majority's quarrel with this plainly deserved dismissal of a criminal prosecution that was insufficiently alleged in the first place and as to which it is clear beyond doubt that the state could not in a host of trial days ever prove? The answer is that the state fancies that it has been shorn thereby of its sole discretion to choose whom to prosecute. The record demonstrates, however, far beyond and doubt that it is not the discretion of the state that has been affected at all. The only thing reflected by the dismissal is the manifest inability on the day of trial of the state to prove any case reasonably deemed charged. The testimony heard by this judgewho, we must not forget, is the trier of factcould not survive a motion for judgment of acquittal, let alone a guilty verdict. And, we should make no mistake, the judge heard essentially what the state could hope to prove in support of its allegation that he "willfully, maliciously, and repeatedly follow[ed] or harass[ed]" his wife. She did not testify to any "emotional distress," much less to any "substantial" suffering. The judge also heard testimony from her that would have supported the husband's legitimate purpose in doing what he did.
So if the judge had simply entered an acquittal on the basis of what he heard, surely no one would seriously suggest that the state could appeal. If he had denied the state's request for a continuance outright, no one could show an abuse of discretion for denying a continuance to produce a witness that the party had not even bothered to subpoena and who the party knew did not want to testify anyway and would not in fact support their case. If indeed he had done any of these things or all of them, could any appellate judge plausibly come to the conclusion that no judge in his/her right mind would have done so?
A reversal of this Solomonic decision is a perversity of justice. It benefits the state not at all because the state has already shown itself unable to prove what it charged. It forces these people who had voluntarily settled their divorce case and had worked themselves past their emotional heartbreak to return anew to their former conflicts and become adversaries once more. And unwilling adversaries at that!
No reasonable punctilio for the exigencies of criminal procedure and prosecutorial discretion can possibly justify this very un Solomonic second guessing of what the judge on the scene realized that simple justice requires. I for one will have no part of this kind of selective "letter-of-the-law" adherence to rules over justice. I therefore dissent.
NOTES
[1] See § 784.048, Fla. Stat. (1997), which in relevant part states:

"(1) As used in this section, the term: (a) `Harass' means to engage in a course of conduct directed at a specific person that causes substantial emotional distress in such person and serves no legitimate purpose.
. . .
"(4) Any person who, after an injunction for protection against repeat violence pursuant to s. 784.046, or an injunction for protection against domestic violence pursuant to s. 741.30, or after any other courtimposed prohibition of conduct toward the subject person or that person's property, knowingly, willfully, maliciously, and repeatedly follows or harasses another person commits the offense of aggravated stalking, a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084."
[2] See Fla. Fam. L.R.P. 12.610(c)(2)(A) ("The temporary and permanent injunction forms in these rules for repeat and domestic violence injunctions shall be the forms used in the issuance of injunctions under chapters 741 and 784, Florida Statutes."). [emphasis supplied]
[3] See § 784.046(2)(a), Fla. Stat. (1997) ("There is created a cause of action for an injunction for protection in cases of repeat violence. (a) Any person who is the victim of repeat violence has standing in the circuit court to file a sworn petition for an injunction for protection against repeat violence."). [emphasis supplied]
[4] Without concluding that this is such a case, it has become all too common for us to see claims of domestic violence in divorce cases, many of which appear to be little more than a tactical basis for, say, child custody or some other advantage in the litigation, or just plain out of ordinary spite. What was certainly a necessary remedy for real victims of actual violence is now sometimes used by otherwise good people whose emotions and judgment are strained by the torment of divorce.
[5] I recognize that the particular assistant state attorney who made the agreement with the wife was not the one present at the scheduled beginning of trial. But that is of no moment to me, as they both assistant state attorneys represent and bind the same public officialthe State Attorneyin prosecuting criminal cases on his behalf.
[6] For that matter, we don't even know if he was ever furnished a copy of it.